IN THE UNIED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND


MARY RYAN and
THOMAS RYAN

**CA 11 - 037 ML**

Plaintiffs

VS.

ROBERT D. KRAUSE, Individually and/or acting in his capacity as agent/representative
and/or member of the Roman Catholic Bishop of Providence, a corporation sole
FRANK WILLIAMS, Individually, and in his capacity of agent/officer/representative
and/or member of Roman Catholic Bishop of Providence, a corporation sole
WILLIAM ROBINSON, Individually,  and in his capacity of agent/officer/representative
and/or member acting in the furtherance of the interests of Roman Catholic Bishop, a
corporation sole
MAUREEN MCKENNA GOLDBERG, Individually, and in her capacity of
agent/officer/representative and/or member acting in the furtherance of the interests of
Roman Catholic Bishop of Providence, a corporation sole
TIMOTHY CONLON, Individually and in his capacity as agent/officer of
CARL DELUCA, Individually and in his capacity as agent/officer and/or member acting
in the furtherance of the interests of the Roman Catholic Bishop of Providence, a
corporation sole
THOMAS BENDER, Individually and as agent/officer of Roman Catholic Bishop of
Providence, a corporation sole, Diocesan Administration Corporation and xyz
corporations and 1-250
WILLIAM T. MURPHY, Individually, and his predecessors and successors in his
capacity as agent of RCB, a corporation sole, Diocesan Administration Corporation, St.
Thomas Church of Manton Corporation, John and Jane Does 1-250 and Corporations
XYZ, and 120, including, but not limited to corporations set forth in this complaint
JAMES MURPHY, Individually and in his capacity as agent/officer of Roman  Catholic
Bishop of Providence, a corporation sole, St. Thomas Church of Manton, XYZ
Corporations, 1-250, John and Jane Does 1-250
BRUCE VEALEY, individually, and in his capacity as Executor of Estate of Louis Dunn,
agent/office of Roman Catholic Bishop of Providence, a corporation sole, and XYZ
Corporation
THOMAS TOBIN, individually, and in his capacity as the Roman Catholic Bishop of
Providence, a corporation sole and/or d.b.a. Diocese of Providence and/or Diocesan
Administration Corporation and/or Corporations XYZ 1-250
ROBERT MULVEE, ALIAS JOHN DOE, individually, and in his capacity as the Roman
Catholic Bishop of Providence, a corporation sole,  and/or d.b.a.Diocese of Providence

and/or Diocesan Administration Corporation

PAUL THEROUX, ALIAS JOHN DOE individually, and in his capacity as Vicar, agent/officer of the Roman Catholic Bishop of Providence, a corporation sole, d.b.a.Diocese of Providence and/or Diocesan Administration Corporation

ROBERT MC CARTHY, ALIAS JOHN DOE, individually, and in his capacity as Educationand Compliance coordinator, agent of the Roman Catholic Bishop of Providence, a corporation sole, d.b.a.Diocese of Providence and/or Diocesan Administration Corporation

ESTATE OF LOUIS W. DUNN, alias JOHN DOE, individually, and in his capacity as Vicar, Pastor, agent/officer, Joyful Servants of Jesus, Christ the King Church Corporation, St. Thomas Church of Manton Corporation, Mother of Hope Novitiate, d.b.a. Sisters of Our lady of Providence, and of the Roman Catholic Bishop of Providence, a corporation sole,  and/or d.b.a.Diocese of Providence and/or Diocesan Administration Corporation

DANIEL P. REILLY, ALIAS JOHN DOE individually, and in his capacity as Vicar, agent/officer of the Roman Catholic Bishop of Providence, a corporation sole,  and/or d.b.a.Diocese of Providence and/or Diocesan Administration Corporation, agent/officer of Roman Catholic Bishop of Worcester

WILLIAM VARSANYI, ALIAS JOHN DOE individually, and in his capacity as Vicar, agent/officer of the Roman Catholic Bishop of Providence, a corporation sole, and/or d.b.a.Diocese of Providence and/or Diocesan Administration Corporation

PETER CAVANAUGH, ALIAS JOHN DOE individually, and and his predecessors and successors in his capacity as Vicar, agent/officer of the Roman Catholic Bishop of Providence, a corporation sole and/or d.b.a.Diocese of Providence and/or Diocesan Administration Corporation

SALVATORE MATANO,ALIAS JOHN DOE, individually, and in his capacity as Vicar, agent/officer of the Roman Catholic Bishop of Providence, a corporation sole, d.b.a.Diocese of Providence and/or Diocesan Administration Corporation

JOSEPH PAQUETTE, ALIAS JOHN DOE, individually, and his predecessors and successors in his capacity as agent/officer of St. Thomas Church of Manton Corporation and the Roman Catholic Bishop of Providence, a corporation sole,  and/or d.b.a.Diocese of Providence and/or Diocesan Administration Corporation

LOUIS GELINEAU, ALIAS JOHN DOE, individually, and in his capacity as the Roman Catholic Bishop of Providence, a corporation sole, and/or d.b.a.Diocese of Providence and/or Diocesan Administration Corporation

ROBERT MC MANUS, individually, and in his capacity as Vicar, agent/officer of the Roman Catholic Bishop of Providence, a corporation sole, and/or d.b.a.Diocese of Providence and/or Diocesan Administration Corporation

JOHN DARCY, individually, and in his capacity as agent/officer of the Roman Catholic Bishop of Providence, corporation sole, and/or d.b.a.Diocese of Providence and/or Diocesan Administration Corporation

GEORGE FRAPPIER, ALIAS JOHN DOE, individually, and in his capacity as Vicar, agent/officer of the Roman Catholic Bishop of Providence, a corporation sole, d.b.a. Diocesan Administration Corporation

JOHN LAVIN, ALIAS JOHN DOE, individually, and in his capacity as agent/officer of

the Roman Catholic Bishop of Providence, a corporation sole, d.b.a.Diocese of
Providence and/or Diocesan Administration Corporation
FRANCIS P. KAYATTA, ALIAS JOHN DOE, individually, and in his capacity as Vicar,
agent/officer St. Thomas Church of Manton Church Corp. and of the Roman Catholic
Bishop of Providence, a corporation sole, d.b.a.Diocese of Providence and/or Diocesan
Administration Corporation
WILLIAM OÕCONNELL, ALIAS JOHN DOE, individually, and in his capacity as
agent/officer of the Roman Catholic Bishop of Providence, a corporation sole,
d.b.a.Diocese of Providence and/or Diocesan Administration Corporation
ESTATE OF ALFRED DESROSIERS, ALIAS JOHN DOE, individually, and in his
capacity as agent/officer of the Roman Catholic Bishop of Providence, a corporation sole,
d.b.a.Diocese of Providence and/or Diocesan Administration Corporation
ESTATE OF MICHAEL LAMOUNTAIN, ALIAS JOHN DOE, individually, and in his
capacity as agent/officer of the Roman Catholic Bishop of Providence, a corporation sole,
d.b.a.Diocese of Providence and/or Diocesan Administration Corporation
EDMOND MICARELLI, ALIAS JOHN DOE, individually, and in his capacity as
agent/officer of the Roman Catholic Bishop of Providence, a corporation sole,
d.b.a.Diocese of Providence and/or Diocesan Administration Corporation
JAMES SILVA, ALIAS JOHN DOE, individually, and in his capacity as agent/officer of
the Roman Catholic Bishop of Providence, a corporation sole, d.b.a. Diocese of
Providence and/or Diocesan Administration Corporation
ROBERT MARCANTONIO, ALIAS JOHN DOE, individually, and in his capacity as
agent/officer of the Roman Catholic Bishop of Providence, a corporation sole, d.b.a.
Diocese of Providence and/or Diocesan Administration Corporation
ROLAND LEPIRE, ALIAS JOHN DOE, individually, and in his capacity as agent/officer
of the Roman Catholic Bishop of Providence, a corporation sole, d.b.a. Diocese of
Providence and/or Diocesan Administration Corporation
JOSEPH DÕANGELO, ALIAS JOHN DOE, individually, and in his capacity as
agent/officer of the Roman Catholic Bishop of Providence, a corporation sole, d.b.a.
Diocese of Providenc and/or Diocesan Administration Corporation
.RICHARD MEGLIO, ALIAS JOHN DOE, individually, and in his capacity as
agent/officer of the Roman Catholic Bishop of Providence, a corporation sole, d.b.a.
Diocese of Providence and/or Diocesan Administration Corporation
BRENDEN SMYTH, ALIAS JOHN DOE, individually, and in his capacity as
agent/officer of the Roman Catholic Bishop of Providence, a corporation sole, d.b.a.
Diocese of Providence and/or Diocesan Administration Corporation
JOSEPH ABBRUZZESE, ALIAS JOHN DOE, individually, and in his capacity as
agent/officer of the Roman Catholic Bishop of Providence, a corporation sole, d.b.a.
Diocese of Providence and/or Diocesan Administration Corporation
.
ALIAS JOHN AND JANE DOES, individually,
and in their capacity as agents, officers, supervisors.
employers, employees, servants, contractors in
furtherance and in the interests of DEFENDANTS
ROMAN CATHOLIC BISHOP OF PROVIDENCE,

A CORPORATION SOLE, d.b.a.
DIOCESE OF PROVIDENCE, and/or
ROMAN CATHOLIC DIOCESE OF PROVIDENCE;
DIOCESAN ADMINISTRATION CORPORATION,
ST THOMAS CHURCH OF MANTON;
JOYFUL SERVANTS OF JESUS;
d.b.a. St. Thomas Prayer Community,
CHRIST THE KING CHURCH CORPORATION;
MOTHER OF HOPE NOVITIATE;
CATHEDRAL OF ST. PETERÕS AND PAUL;
MONSIGNOR VIANNEY HOUSE;
OUR LADY QUEEN OF MARTYRS;
ST. MARYÕS CRANSTON;
ST. JOSEPHÕS CHURCH OF PASCOAG
ST. MARYÕS NEWPORT;
ST. JOAN OF ARC, CUMBERLAND;
ST. CATHERINEÕS CHURCH, WARWICK;
ST. KEVINÕS CHURCH, WARWICK;
CATHOLIC YOUTH ORGANIZATION CORPORATION;
ST. JOSEPHÕS CHURCH;
SS. PETER AND PAUL;
ST. ALEXANDER CHURCH;
ST. ANNÕS CHURCH, CRANSTON;
ST. JOSEPH CHURCH, NEWPORT;
ST. JOHNÕS CHURCH, PROVIDENCE;
OUR LADY OF MT. CARMEL, PROVIDENCE;
ST. MARGARETÕS CHURCH, RUMFORD;
OUR LADY OF GRACE CHURCH, JOHNSTON;
OUR LADY OF MERCY CHURCH;
PRECIOUS BLOOD PARISH;
ST. AGATHAÕS CHURCH, WOONSOCKET;
ST. CLAREÕS CHURCH, MISQUAMICUT;
ST. THERESA OF THE CHILD JESUS PARISH;
ST. JOHN THE EVANGELIST CHURCH, NO. SMITHFIELD;
HOLY GHOST CHURCH, NORTH TIVERTON;
SACRED HEART CHURCH, WEST WARWICK;
ST. JOHN VIANNEY CHURCH, WEST WARWICK;
ST. ALOYSIUS CHURCH, WOONSOCKET;
ST. MATTHEWÕS CHURCH, CENTRAL FALLS;
ST. LEO THE GREAT, PAWTUCKET;
HOLY FAMILY PARISH, WOONSOCKET;
ST. CATHERINEÕS PARISH, WARWICK;
CORPORATIONS, ALIAS, XYZ CORPORATIONS 1-250

DEFENDANTS

**TABLE OF CONTENTS**
I. NATURE OF THE ACTION

II. THE PARTIES
A. Plaintiffs
B. Defendants
1.) Judicial Defendants

2.) Attorney Defendants
3.)Hierarchical/Corporate
4.) Employee Defendants
5.) Corporation Defendants
6.) XYZ Corporations 1-250 30
7.) Jane and John Doe, alias 1-250
III. JURISDICTION
IV. FACTUAL ALLEGATIONS
IV. COUNTS
V. DAMAGES
VI. REQUEST FOR RELIEF

## II. THE PARTIES

A. Plaintiffs

  Plaintiffs Thomas Ryan and Mary Ryan are citizens of the Staet of Rhode Island who sought relief in the R.I. Superior Court and R.I. Supreme Court for damages that they received by defendants who had engaged in criminal conduct including, but not limited to, sexual assault, fraud, conspiracy, bribery, harboring and compounding the felonies of other criminals as well as a criminal coverup of the sexual exploitation and abuse of children and vulnerable adults.

B. Defendants

### 1.) Judicial Defendants

  Robert D, Krause, is a resident of Rhode Island and sits as a trial justice on the R.I. Superior Court

  Frank Williams is a resident of Rhode Island and held the position of Chief Justice of Rhode Island and presently sits on an appellate mediation court at the R.I. Supreme Court level.

  Maureen McKenna Goldberg is a resident of Rhode Isand and sits as a justice on

the R.I. Supreme Court and the Board of Trustees of St. Mary's Bayview

William Robinson is a resident of Rhode Island and sits as a justice on the R.I. Supreme Court

## 2.) Attorney Defendants

Thomas Bender, Esq. is a defense attorney involved in Ryan vs. Roman Catholic Bishop of Providence, a corporation sole, etal. and other plaintiffs' cases consolidated under the caption Daniel Heroux, et al. vs. Roman Catholic Bishop of Providence, etal.

William T. Murphy, Esq. is a defense attorney involved in Ryan vs. Roman Catholic Bishop of Providence, et al.and other plaintiffs' cases consolidated under the caption Daniel Heroux, et al. vs. Roman Catholic Bishop of Providence, etal.

Timothy Conlon, Esq. acted as a plaintiffs' attorney in some other plaintiffs' cases consolidated under the caption Daniel Heroux, et al. vs. Roman Catholic Bishop of Providence, etal.

Carl DeLuca, Esq. acted as a plaintiffs' attorney in some other plaintiffs' cases consolidated under the caption of Daniel Heroux, et al. vs. Roman Catholic Bishop of Providence, etal.

Bruce Vealey, Esq. acted as civil and criminal defense attorney for Louis Dunn, and remains the Executor of Dunn's Estate and acted in furtherance in the interests of the Roman Catholic Bishop of Providence, a corporation sole

## 3.) Hierarchical/Corporate and/or Employee Defendants

Defendants Tobin, Theroux, Darcy, Cavanaugh, Gelineau, Theroux, Dunn, Mulvee, Angell, Reilly, Matano, Paquette, Darcy, Plante, Kayatta, Lavin, Micarelli, LaMountain, Desrosiers, Marcantonio, Silva, Lepire, D'Angelo, Meglio, Abbruzzese, are or previously resided in the State of Rhode Island and are all defendants who were named in the Ryans' complaint for defendants' culpable pattern of criminal conduct and/or conspiracy and fraudulent conduct concealing and compounding felonies, through various methods, including, but not limited to, bribery, fraudulent transfers, extortion, intimidation of witnesses and religious duress and defendants' liability for their intentional tortuous conduct on so many levels. Several of these defendants (including Dunn) were convicted for their criminal conduct of sexual assaults on children.

## Defendants

Defendants, individually and through their corporate entities, claim to lead, teach and sanctify the "People of God", who constitute the community of the "Church" in

the ÒDiocese of Providence *(App. Tabs 121B, 10)*   The defendants claim that it Òis the

role of the Church to reconcile persons to God.Ó *(App. Tabs 121A, 11)*   The defendants

teach that priests are ÒOne with ChristÓ and consider themselves Ambassadors and

Icons. *(App. Tabs 59, 121B)*   Similar to the teaching of the Council of Trent, the

defendants advocate the teachings of St. Jean Vianney, who claimed that if there were a

priest and an angel walking down the street, it would be expected that one would bow to

the priest first.  *(App. Tab 59, p.47)*   The defendants claim that nearly 68% of the

population of the State of Rhode Island worship in the Catholic Faith and carry out their

teachings through various corporations which are made up of parishes, schools, offices

and other agencies, including 58 elementary and high schools, and 152 parishes and

shrines.   The defendants claim there are 299 diocesan priests, 121 religious priests, 108

deacons, 605 religious sisters and 74 brothers who serve the ÒDiocese of ProvidenceÓ

which the defendants refer to as a Ògeographic delineation for a communityÓ of

Catholics.   The diocesan boundaries are set out by the Vatican, also referred to as the

ÒHoly See.Ó   The diocese of Providence is part of the so called ÒMetropolitan See in

the Archdiocese of Hartford, located in Hartford, Connecticut. *(App. Tab 121B, p. 10)*

R.I.G.L. ¤7-6-3(3c) recognizes the ÒDiocese of Hartford.Ó

**The Defendants adhere to the Code of Canon Law**

The defendants adhere to the Code of Canon Law of the Roman Catholic Church

set out by the Holy See. *(App. Tabs 59, 121A, 121B, 20-21)*   Defendants claims that

Canon Law of the Roman Catholic Church is the

Òthe collection of written and customary rules promulgated by competent
ecclesiastical          authority for the practical administration of the Roman Catholic
Church.*** It is a body          of operational rules setting forth in practical terms
the relationships defined in the          religious teachings of the Church.  These
teachings have been put forth in documents          produced by the Second Vatican
Council, which met from 1962 through 1965.  Among          other things, it
governs the rights and duties of bishops toward their priests and spells out  clearly the
manner in which a bishop may impose sanctions or other disciplinary

measures upon a priest and the circumstances when such may be invoked.Ó *(App.
Tabs          121A, 12)*

7

ÒCanon Law is the universal law governing the Catholic Church, and applies to the some one billion members of the Church living in diverse geographic regions and enjoying widely divergent social customs and practice.Ó *(App. Tab 121A-15)*

### The VaticanÕs Instructions to impose Secrecy on witnesses regarding sexual abuse

On May 18, 2001, Joseph Ratzinger issued EPISTULA A CONGREGATIO PRO DOCTRINA FIDEI MISSA AD TOTIUS CATHOLICAE ECCLESIAE EPISCOPUS ALIOSQUE ORDINARIOS ET HEIRARCHAS INTERRESSE HABENTES: DE DELICTIS GRAVIORIBUS EIDEUM CONGREGATIONI PRO DOCTRINA FIDEI RESERVATIS (LETTER FROM THE CONGREGATION FOR THE DOCTRINE OF THE FAITH SENT TO ALL BISHOPS OF THE CATHOLIC CHURCH AS WELL AS TO ORDINARIES AND HIERARCHS HAVING AN INTEREST: CONCERNING VERY GRAVE SINS WHICH ARE RESERVED TO THE DOCTRINE OF THE FAITH specifically refers to the Vatican Document known as Crimen Sollicitationis, which had been secretly issued by the Supreme Sacred Congregation of the Holy office on March 16, 1962. The document acknowledges the fact that the procedural instruction set out in the Crimen document remained in force as of the date of May 18, 2001 and reaffirms the direction that ÒCases of this kind are subject to the pontifical secretÓ. Entitled ÒINSTRUCTIO, DE MOD PROCEDENDI IN CAUSIS SOLLICIATIONISÓ , the document instructs Bishops worldwide to follow a specific procedure when incidents of sexual abuse are reported, such as occurred in the instant case. *(App. Tabs 58, 152) Consistent with the procedures set forth in Crimen Solliciationis,* when sexual abuse has been reported to the defendants, the defendants are required to comply with Canon Law, not R.I. Civil Law. According to the defendants, and the Code of Canon Law, the defendants are to conform to civil law, unless it conflicts with the Code of Canon Law. The defendants state that they are obligated to to comply with secrecy, privacy and confidentiality. The defendants impose secrecy on witnesses. *(App. Tab 121A, par. 23)*

8

Unless documents related to the abuse are necessary for the ecclesiastical Òpenal

processÓ, all documents relating to investigations and the decrees of the Bishop by which

the investigation was opened and closed are to be kept in the secret archive of the curia

pursuant to Canon 1719, which are Òimmovable, completely closed and lockedÓ, with

the key in the possession of the bishop. *(App. Tabs 121A, 28)* Documents in the secret

archives which concern criminal cases are to be destroyed if the person accused has died,

or if ten years has passed since the imposition of sentence in accordance with the

*ecclesiastic* Court system set out by the Code of Canon Law. *(App. Tabs 121A, 28)*

### Without God, youÕre dead

According to the defendants, the basic doctrine of the Catholic Church/Vatican

State claims that every human being is born with sin and are not in union with God.  The

defendants claim that the only cure for this *Òotherwise permanent and irremedial*

*breachÓ is* Jesus Christ, which can only be found in the Catholic Church through

sacraments which were set out by Jesus Christ and can only be administered by a priest.

Baptism is the sacrament of initiation which Òinitially creates a relationship between a

human being and God.Ó *(App. 121A-11)*  Without access to the defendants, persons are

without access to God.  In 1885, following the establishment of several dioceses in the

United States, Pope Leo XIII, issued his encyclical *ÒImmortale DeiÓ  (Immortal God)*:

ÒTo despise legitimate authority, in whomsoever vested, is unlawful, as a
rebellion against        the divine will, and whoever resists that, rushes willfully to
destruction. He that resisteth        the power resisteth the ordinance of God, and they
that resist, purchase to themselves        damnation. * * *  Wherefore, for this
purpose, care must especially be taken to preserve        unharmed and unimpeded the
religion whereof the practice is the link connecting man with        God.Ó *(Judicial
Notice, Doc No. 19, App. Tab 152)*

### The defendants are the only vehicle to God

The defendants are men who become priests through the conferral of the

Sacrament of Holy Orders (see Canon 1008), by which, according to Catholic teaching,

they receive the power to celebrate the Eucharist (i.e. the Mass) and to forgive sins in

Christ's name in the administration of the Sacrament of Reconciliation. (121A, 16)
Upon ordination to the presbyterate (that is, the priesthood), a man immediately
*undergoes a permanent change in his being,* referred to in the Canon Law as a special
"character" *(App. Tab 121A) (emph. added)*

According to defendant Gelineau, in the Catholic Faith, the Eucharist, also called
the Mass, is the central act of worship, and its celebration is the summit of the Catholic
Faith.  When *the priest* at the moment of consecration *utters* the words: "This is my
Body" and "This is my Blood", *it is believed that Jesus Christ comes to be present at
that point in time and space,* that He *is truly and really present as if he were bodily to
walk through the door into the room* where the Eucharist is being celebrated.
Reconciliation is one of the two Sacraments whereby a person in sin - that is separated
from a personal relationship with god - can reenter a personal relationship with God.
*Through the utterance* of the words of absolution *of a priest* the penitent reenters a
relationship with God.  *Only a priest* can administer Reconciliation to a penitent.  *(App.
Tabs 121 B, 4-5) (Emph. Added)*  According to the defendants,  priests are teachers and
rulers of the faith and are to be obeyed.

Bishops are selected among priests.  A Diocesan Bishop, the head of the Diocese,
and his delegates, are obliged to the Vatican and to follow Canon Law  A bishop has an
obligation to show concern for all Catholics entrusted to his pastoral care.  *(App. Tab.
121A, 121B, 59)*  The Bishop held a fiduciary relationship with the Ryans. *(App. Tabs
152, 16)*

4.) Corporation Defendants

Defendant Corporations are the venues utilized to carry out their criminal and
fraudulent conduct.

5.) John and Jane Does, 1-250

6. XYZ Corporations 1-250

III. JURISDICTION

## JURISDICTIONAL STATEMENT

This CourtÕs jurisdiction is invoked pursuant to 28 U.S.C. ¤1257(a)

FACTUAL ALLEGATIONS

Thomas and Mary Ryan were faithful Catholics from early childhood. Mary was religious, and was a daily communicant for many years. Mary performed a substantial amount volunteer work for the defendants. The Ryans were baptized and received Holy Communion. Mary Ryan received confirmation by defendant Gelineau with the assistance of Louis Dunn. Mrs. Ryan believed the teachings of the the defendants and remained a faithful Catholic. Consistent with the teachings of the defendants, she believed that priests were God on earth,were to be obeyed and that they were one with Christ *(App. Tab. 7, p.; 170, 59, p 44-45, App. 7, p. 34)* Mary Ryan believed that there was no other way to be in union or reconciled with God, but through a priest. *(App. Tab. 121A, 121B)* Mary Ryan participated in the Diocesan C.Y.O.Õs, lectures, retreats, Bible Study and other Diocesan sponsored activities.

Mary Ryan met Louis Dunn when she was approximately fourteen years old, as she occasionally attended Mass at St. Thomas Church of Manton. Malverina Sheehan, Mary RyanÕs Mother, eventually became employed by Defendants Louis Gelineau and Louis Dunn. Mary Ryan would fill in for her mother from time to time, cooking at St. Thomas Rectory. Louis Dunn owned and operated the Joyful Servants of Jesus Corporation d.b.a. St. Thomas Prayer Community, which nurtured the Catholic Church Charismatic Renewal of the 1970Õs.

Following a Convention in Atlantic City in approximately 1976/77, Mary Ryan, as a young teenager, entered a pastoral/counseling relationship at Louis DunnÕs request in order for him to counsel her regarding the abuse she had suffered at the hands of her

biological father from the age of three until she was approximately thirteen to fourteen years old. Louis Dunn had claimed that he received the information directly from God. *(App.Tab. 7, 37-38)* Mary Ryan believed him. *(App. Tab 7, 38)* Claiming to be sanctioned by God, Louis Dunn took on a parental role and publicly fostered a father/daughter relationship with Mary Ryan. *(Judicial Notice PSR)* At the insistence of Monsignor Dunn, Mary Ryan worked at St. Thomas Church of Manton performing clerical and other duties. *(App. Tab 58)* Dunn corrected her homework, told her who she could maintain friendships with and who she could or couldnÕt date. From the time she was approximately sixteen years old, while counseling Mary Ryan and as a surrogate father, Dunn utilized his position as a priest and began a pattern of exploitation and abuse of Mary Ryan for his own sexual gratification. *(App. Tab. 8)* Mary Ryan was forced to succumb to the sexual exploitation within the framework of a counseling, spiritual director, father/daughter bond, religious rituals and the Sacrament of Reconciliation. The exploitation took place in various locations, including, but not limited to, St. Thomas Church, St. Thomas Rectory, Mother of Hope Novitiate, in and out of the State of Rhode Island, other properties own the defendants, the Joyful Servants of Jesus Apartment/house, and Matunuck Beach Road. *(App. Tab. 58)* Louis Dunn continued to counsel Mrs. Ryan and foster his father/daughter relationship through the entire time of the sexual exploitation and thereafter. *(PSR, App. Tab 58, 96)* Louis Dunn forbid Mrs. Ryan to attend college, until he allowed her to take one class when she was approximately twenty years old. After four years of sexual exploitation, it finally ended. However, the psychological exploitation and abuse did not end there. In the fall of 1982, the Ryans began dating and were engaged shortly after with the express permission and in the presence of Louis Dunn. *(App. Tab 58)* The Ryans were forbidden, however, to be married in the Roman Catholic Church unless Mr. Ryan had been granted an annulment from the Vatican. Otherwise, the marriage would not be considered valid in the eyes of God.

**Louis Dunn counsels Thomas Ryan**

Louis Dunn, as an Ecclesiastic Judge, counseled Thomas Ryan in preparation for the annulment. Louis Dunn processed and obtained an annulment from Rome so that Thomas and Mary Ryan could legally be married in the eyes of God through the Roman Catholic Church, i.e. the Vatican State. *(App. Tab p. 58)*

**Louis Dunn prepares the Ryans for Marriage**

The Ryans maintained a parental presence and counseled the Ryans prior to and during their marriage on morals, financial and other responsibilities, etc. Prior to their marriage, the Ryans were mandated to participate in a pre-cana weekend under the supervision of Louis Dunn. Louis Dunn prepared the Ryans for marriage. Louis Dunn continued to foster a father/daughter relationship with Mary Ryan. Dunn publicly walked Mary down the aisle as her father, gave her away, performed the ceremony, danced the father/daughter dance, and continued his parental role in the RyansÕ life. Although Mr. and Mrs. Ryan had already paid for their wedding, Louis Dunn insisted that he reimburse them. *(App. Tab 105)* Louis Dunn stated that it was right thing to do for his daughter. Dunn expected the Ryans to have dinner with him at the rectory at least once a week and to attend Mass there regularly even though the Ryans lived thirty minutes away in Mapleville, Rhode Island. The Ryans continued their relationship with Louis Dunn until he became angry at Mrs. Ryan because she became pregnant. As a result of DunnÕs angry outbursts and repeated harassment, Mrs. Ryan had to leave her classes. Although Louis DunnÕs anger seemed to subside after he entered counseling, his angry rages returned after the birth of the RyansÕ infant son. Dunn expressed his jealousy and anger toward the baby. At approximately five months old, the baby developed a tumor. *(App. Tab 7)* Mrs. Ryan believed it was a result of the circumstances involving Dunn. Mrs. Ryan still believed Louis Dunn possessed the power of God, and that he certainly could do anything to her at anytime he cared to. Mrs. Ryan tried to put Dunn out of her life, but continued to fear Louis Dunn for many years, until long after 1993. *(App. Tab 58, 7, 34)*

13

**The Discovery**

In November of 1993, Mary Ryan discovered that Monsignor Louis Dunn was a fraud, and that the sexual assaults and exploitation by him that she had endured from the ages of sixteen to twenty one were not acts of God as she had been made to believe by Dunn, but a bad joke. *(App. Tab 7, 58)* Mary Ryan entered a state of emotional shock. (App. 96, 97, 98, 99, 100, 103) The RyansÕ world turned upside down. Mary Ryan began to disclose the incidents to her husband Thomas, her friends Dr. Kristine Cunniff, Kathleen Perri, and Fr. Gene Pistacchio. As the parents of four children, Thomas and Mary were compelled to go forward and contact the authorities for the protection of other young girls and children who may have encountered Louis Dunn.

**The Ryans turn to Louis Gelineau**

The Ryans turned to Bishop Louis E. Gelineau for counselBishop Gelineau scheduled the Ryans, Antonio and Kathleen Perri, the PerrisÕ attorney, and Fr. Gene Pistacchio to meet with him at 1 Cathedral Square, Providence, Rhode Island,  on February 25, 1994, to discuss the matter.

**Louis Dunn tries to silence Kathleen Perri**

On February 17, 1994,  Kristine Cunniff disclosed to her mother, Kathleen Perri, that Louis Dunn had sexually assaulted Mary Ryan and had made sexual innuendoes toward her younger daughter Johanna years before when she was twelve years old while home alone with Louis Dunn. Kathleen Perri arrived at St. Thomas Rectory that evening and confronted Louis Dunn.  Louis Dunn claimed that he did not recall the incident with her twelve-year-old child, but acknowledged that it was possible and apologized. Kathleen also confronted Dunn about his abuse of Mary Ryan.  Louis Dunn admitted to Kathleen Perri that he had sexually abused Mary Ryan in KathleenÕs home and asked Kathleen if she would keep the information confidential until after his retirement in June of 1994.  Kathleen refused and told Louis Dunn that he should contact Mary and beg for her forgiveness.

**Louis Dunn attempts to silence Fr. Gene Pistacchio and Mary Ryan**

On February 23, 1994, two nights before the scheduled meeting with Bishop Gelineau, Louis Dunn contacted Fr. Gene Pistacchio and requested that Fr. Gene hear his confession over the telephone. Fr. Gene recognized that Louis Dunn was abusing the confessional in order to eliminate Fr. Gene as a witness pursuant to the Code of Canon Law. Fr. Gene refused to enter the seal of confession with Louis Dunn. After Fr. Gene refused, Louis Dunn requested that Fr. Gene consider having a prayer/ healing service for himself and Mary Ryan. Louis Dunn admitted that he had had sexual contact with Mary Ryan while counseling her on the abuse of her biological father in order to heal her because she had a poor image of her body. Fr. Gene later recognized that a prayer service was also being used by Louis Dunn to eliminate Fr. Gene as a witness. *(App. Tab. 99)* Louis Dunn claimed that he had sexual contact with other persons. *(App. Tab. 99; PSR)*. Fr. Gene told him that he was was upset with the bishops for not taking responsibility and told Louis Dunn that he should accept whatever punishment he received. *(App. Tab.105)*

**Bishop Gelineau attempts to induce the Ryans into silence**

On February 25, 1994, when the Ryans arrived at attorney Mary McCaffreyÕs office, they were informed that Bishop GelineauÕs office had called her to advise them that he was unaware that an attorney would be attending the meeting and claimed that he could not meet because his attorneys were not available. Ms. McCaffrey contacted Bishop GelineauÕs secretary, Monsignor Jacques Plante, to request a rescheduling of the meeting to a later time that same day, because Fr. Gene Pistacchio had traveled from New Jersey to attend the scheduled meeting. Monsignor Plante advised Ms. McCaffrey that Bishop Gelineau would not be available until 2:00 P.M., the time of the scheduled meeting. At 2 p.m., Monsignor Plante advised Ms. McCaffrey that the attorneys could not meet that afternoon. The Ryans requested that the meeting be rescheduled to accommodate the BishopÕs legal counsel. In the presence of five witnesses, via speaker telephone,

Monsignor Plante advised that Bishop Gelineau would only meet with Mary Ryan *alone and under the seal of confession.* Otherwise, Bishop Gelineau would consider her an *adversary* and refer her to Lt. Robert McCarthy. *(App. Tabs 96, 97, 98, 99, 102, 103)* The Ryans later discovered that Bishop GelineauÕs tactics to induce the Ryans into silence have been used with numerous victims of sexual abuse to intimidate them and maintain their silence. *(App. Tab 152)*

**Louis Dunn again tries to silence Mary Ryan, claiming he Ònever understoodÓ**

Following the BishopÕs cancellation of the meeting, Mary Ryan received a letter from Louis Dunn dated February 24, 1994, acknowledging the fact that he had spoken to Fr. Gene Pistaccchio on February 23, 1994. Louis Dunn asked Mary Ryan to partake in a Òhealing serviceÓ. Louis Dunn wrote: Òhe [Fr. Gene] explained to me as well as he could your hurt and your anger, *most of which I never understood.* I am very sorry for causing you pain...I am praying for you that the hurt will begin to lessen. I ask you to pray for me.Ó *(App. Tab 101)*

**Kathleen Perri turns to Bishop Gelineau**

On March 3, 1994, Kathleen Perri sent a certified letter to Bishop Louis E. Gelineau regarding her knowledge of the circumstances, and turned to him for guidance. *(App. Tab 130)* Kathleen told Gelineau of the incident involving Louis Dunn and her daughter Johanna, and her conversation with Louis Dunn on February 17, 1994. She told Bishop Gelineau that Louis Dunn had admitted to her that he had sexually abused Mary Ryan. ÒThe abuse of Mary did not end with the sexual encounters. Louis Dunn defamed the Ryans for years...Ó *(App. Tabs, 103, 164-166, )* Kathleen Perri told Bishop Gelineau that she was devastated, that her life had turned upside down, and she was trying reconcile the shock of Louis DunnÕs abuse to that of his being a father to Mary. She witnessed Louis Dunn foster a father/daughter relationship with Mary and watched him give away the bride at her wedding. Kathleen told Bishop Gelineau that Louis Dunn had told her years before

16

of the sexual abuse Mary Ryan had suffered at the hands of her biological father, and the

fact that Louis Dunn thought Mr. Sheehan to be a heinous man.        Pertinent portions of

Mrs. PerriÕs letter is as follows:

> ÒI want to be able to forgive his action and I try to think of him as a sick human
> being but I become very angry when I think of this continued Re victimization of
> Mary. Fr. Dunn knew of the sexual abuse Mary suffered from the age of 3-13
> years old at the hands of her   father. He took on the role of a father figure, gained
> her trust and confidence and at the age of 16 or 17 he began victimizing her

himself. This went on for years. Fr. Dunn was            the one who told me about
the sexual abuse MaryÕs father inflicted upon her. He thought       Mr. Sheehan to be a
heinous monster. I donÕt understand! *** ÒI sit here and I wonder            about
the safety of the vulnerable people Fr. Dunn has access to. I believe at the present
        time you have a very dangerous man in a powerful position at St. Thomas. Fr.
Dunn told        me that he has resigned as pastor and would probably be removed
of his pastoral duties        by June. Will he continue to be allowed to have access to
vulnerable people in the name        of pastoral ministry after his retirement?
Will you indeed keep him there until June? I            understand that he isolated
himself over the weekend under the guise of illness. *** I            think there is
something radically wrong with an institution that has so many instances        of this
kind of abuse. In GodÕs name what is going to be done about it???? So far nobody
        has reached out to that young woman who has been used, abused, and continually
            victimized. Fr. Dunn asked me on that Sunday night I confronted him
what he should do            and I told him that he should crawl on his hands and knees
to Mary begging her            forgiveness. So far as I know of, as of this date, he
has written one ambiguous letter            about healing and is currently hiding out in
the rectory...Ó *(App. Tab 103)*

### Bishop Gelineau claims ignorance and tries to silence Kathleen Perri

Bishop Gelineau contacted Kathleen Perri and acknowledged his receipt of her

letter. Bishop Gelineau asked her if she would keep the information quiet; she refused.

*(App. Tab 104)* Bishop Gelineau asked Kathleen if either she or the Ryans had any

intention of suing. Kathleen advised him that she had no desire to sue and neither did the

Ryans. Kathleen told Bishop Gelineau that all he had to do was contact Mary, apologize

and validate her as a human being in the wake of the sexual abuse she had suffered from

Louis Dunn. Bishop Gelineau told Mrs. Perri that *his lawyers would not allow him to do*

that. *(App. Tab 102)*

## Defendant McCarthy contacts Mary Ryan and tries to intimidate her

On or about March 7, 1994, Mary Ryan was contacted by Robert McCarthy, via telephone. He identified himself as ÒLieutenantÓ Robert McCarthy, an independent investigator of the Diocese of Providence. Since statements had been made by Bishop Gelineau that Mrs. Ryan was considered an adversary, Mary Ryan refused to discuss anything with him. *(App.Tabs 107, 108, 109)*

## Robert McCarthy interviews Louis Dunn and determines there is no claim

On March 10, 1994, Mr. Robert McCarthy interviewed Louis Dunn. Dunn admitted that he had made sexual contact with Mary Ryan while counseling her on the abuse of her biological father and fostering a father/daughter relationship. He acknowledged that he had paid for the RyansÕ wedding after he and the Ryans had Òopened up the envelopes.Ó Dunn then described Mary Ryan as being vengeful and forceful, that Òfriends say she is losing it. Her house is never clean. She educates her four kids at home.Ó *(App. Tab 105)*   Dunn told Mr. McCarthy to thank Bishop Gelineau and that he (Louis Dunn) would do whatever Bishop Gelineau wanted of him. He went on to state: Ò*I appreciate all that he has done so far.*Ó *(App. Tab. 105)* Mr. McCarthy concluded his statements by saying: ÒIt appears from this statement, if true, *no violation of the general law either criminal or civil has taken place* although some commandments have been broken. Both myself and attorney Vealey were in agreement. This investigation is to be continued with further interviews of *various parties involved.*Ó *(App. Tab. 105, emph. added)*

## The Ryans begin to Discover Bishop GelineauÕs betrayal, fraud, concealment and conspiracy

The Ryans were devastated  by Bishop GelineauÕs response, or lack thereof, and their discovery that he had betrayed the Ryans and deliberately had set out to damage them.  News reports published by Bishop Gelineau were released from the diocese that

led the public to believe that the Bishop had no idea of any criminal conduct by Louis

Dunn or who the Ryans were, when in fact he knew exactly what was going on, and the

fact that Dunn had admitted his conduct to defendants Gelineau and McCarthy. *(App.*

*Tab. 106)*

**Bishop Gelineau continues to conceal any knowledge**

In March of 1994, Anthony and Phyllis Hutnak disclosed that Louis Dunn had

assaulted Phyllis Hutnak in the late 1960Õs and early 1970Õs.  The defendants issued a

public statement and concealed the fact that the Ryans had contacted them, or that they

had knowledge of DunnÕs criminal conduct.  *(App. Tabs, 106, 107)*

**The defendants begin a campaign against the Ryans**

Unknown to the Ryans, the defendants began an active campaign to discredit the

Ryans and conceal the fact that the Ryans had a claim against either Louis Dunn or any

other defendant.  The Ryans had no understanding of the depth or the magnitude of the

defendantsÕ involvement in the concealment of crimes, nor could the Ryans ever have

imagined that the defendants have been involved in any such criminal conduct no more

than the citizens of the United States could when the defendants were nationally exposed

in 2002. *(Tab 55, p6))*  The defendants used their privileged position and

misrepresentations to intimidate witnesses and obtain personal information about the

Ryans, their family and others. *(App. Tabs 129, 13)*

**Mr. McCarthy represents himself as an independent investigator to the public**

On more than one occasion in the early spring of 1994,  ÒLt.Ó McCarthy

presented himself as a police officer and independent investigator to a number of

parishioners of St. Thomas Church, held private meetings on the premises, and

interviewed a number of parishioners to investigate the the RyansÕ ÒallegationsÓ

regarding Louis Dunn.  Defendant McCarthy tape recorded several individuals for the

purposes of gathering information about the RyansÕ personal lives and the lives of their

family. *(App. Tabs. 127, 130)* Documents set forth in the appendix as exhibits 127 and

130 *are d*ocuments not docketed or filed in the RyansÕ case, but pertain specifically to the Ryan case.

**Defendant Joseph Paquette defames Mrs. Ryan**

In approximately April of 1994, defendant Fr. Joseph Paquette told at least parishioner Katherine Hetherman that Mary Ryan was nothing but a liar, and that the RyansÕ claims were false. *(App. 58, 96)* Mary Ryan contacted Joseph Paquette and asked him why he had told Mrs. Hetherman that she had lied.  Fr. Paquette stated that he had been instructed to not speak with Mary Ryan. *(App. Tab 96)*

**Defendant McCarthy conceals his knowledge and misrepresents information**

On April 14, 1994, Robert McCarthy, wrote to Richard Cappalli, an attorney who the Ryans later hired, and advised him in a letter:

Òon *February 25, 1994,* at approximately 3 pm, this office was advised that *an unknown        female party* had made allegations about sexual misconduct involving Monsignor Louis        Dunn...Ó

ÒWe were further advised that this *unknown female* was represented by Attorney Mary        McCaffrey.Ó

ÒOn March 7, 1994, this office *after learning the identity of the alleged victim* contacted        Mary Ryan at her residence.Ó

Mr. McCarthy also claimed to Mr. Cappalli that he wanted an interview:

ÒIt is the policy of the Diocese of Providence to fully investigate any and all allegations        of sexual misconduct involving its clergy and any of its employees. *The intent of this        policy* is to bring the facts and circumstances of the complaint as soon as possible to this        office *so that an investigation will commence immediately.*  Part of this investigation        involves th*e gathering of written and oral reports involving the allegations and an        interview with the party making the allegations.Ó (emph.)*

The Ryans began to discover that Mr. McCarthyÕs interviews were not to investigate the crimes of Louis Dunn, but to prepare a defense in anticipated litigation. The Ryans discovered that the defendants had filed an interrogatory answer dated April 14, 1994, in another personÕs case which disclosed:

20

Ò...information gathered or documents prepared *by Robert N. McCarthy, as same constitute writings obtained or prepared by him as agent and investigator* for defendant (Bishop Louis E. Gelineau)...*in anticipation of litigation and preparation for eventual trial.Ó*

## Defendant Gelineau interferes and defames the Ryans

The Ryans wrote a letter to Bishop Louis E. Gelineau on May 11, 1994. *(App. Tab. 108)* The Ryans were informed that Fr. Joseph Paquette was not the only priest who had been instructed to not speak with the Ryans. In the presence of Frank Santafede, Fr. Roger Gagne advised Mrs. Ryan that he had been ordered by Bishop Gelineau and counsel not to speak with the Ryans. The Bishop and his representatives had told Fr. Roger Gagne that Mary Ryan was lying, that she had mixed memories of her biological father abusing her. Fr. Gagne told Mary Ryan that *Bishop Gelineau* had told him that Malverina Sheehan, MaryÕs mother, did not even believe her, when in fact, Mrs. Sheehan felt betrayed by defendants Dunn and Gelineau whom she had trusted. *(PSR)* Fr. Gagne stated that he didnÕt see anything inappropriate in Louis DunnÕs relationship with Mary Ryan and that Louis Dunn had been a father to Mary. Fr. Gagne did witness inappropriate behavior with a number of other women in the rectory, . *(App. Tab 96 )*

## The Defendants continue to conceal their knowledge

After the diocese issued a press release to the media, and claimed that they had been contacted by an Òunknown femaleÓ, a number of women came forward and reported that they had been abused by Louis Dunn. The Ryans began to discover that the defendants had known for years that Louis Dunn, along with a number of other priests, were sexual predators, and that the defendants had deliberately and knowingly placed them where they would have access to innocent and unsuspecting victims, while priests were being held out as holy men, equipped with the power of God. *(App. Tabs 114, 121B, 135, 136, 110, 116, 122 )* When there had been reports of sexual abuse to the defendants, they had used various methods, such as religious intimidation, monetary settlements, and other tactics, to induce the victims or reporters into silence so as to conceal their

wrongdoing and the wrongdoing of the others. *(Judicial Notice of attachments to Daniel Heroux's complaint)* Over the course of the years, the Ryans discovered that the scope of the defendants' conduct was far-reaching -- all the way to Rome. *(App.Tab 152)*

### The Ryans begin to discover the long criminal history of Louis Dunn

Louis Dunn was a delegate of the Roman Catholic Bishop of Providence, and one and the same as a number of corporate defendants, including, but not limited to, Roman Catholic Bishop of Providence, a Corporation sole, Mother of Hope Novitiate, Christ The King Church, St. Thomas Church of Manton and the Joyful Servants of Jesus. *(App. Tabs 114, 186)* Louis Dunn held himself out as a holy man one with God, as did defendants Gelineau, Angell, and Reilly. Sanctioned by defendants Gelineau, Angell and Reilly, Dunn carried out his representations through defendants Roman Catholic Bishop of Providence, a corporation sole, St. Thomas Church of Manton and other corporate vehicles as previously mentioned. Louis Dunn was a hierarchical defendant named in thirty-nine cases for his role in the cover-up of crimes committed by himself and other perpetrators. (Model Complaint-Daniel Heroux, 92-5807) Following his appointment as Secretary to the Bishop, Vice-Chancellor, and Chancellor of the Diocese of Providence, Louis Dunn was appointed as Vicar for Religious. As Vicar for Religious, Louis Dunn was a delegate of the Bishop for the purposes of supervising programs involving young women seeking to enter religious in and across the State of Rhode Island. *(App. Tab. 59)* Recruiting young girls from local diocesan high schools, and a nursing program at R.I. Hospital, he trained young girls in preparation to enter religious life. Part of that training included his command to girls that they kneel before Dunn on their hands and knees and kiss his feet to prove their humility and worthiness to God. *(App. Tab 96)* Louis Dunn would also question the young girls about their sexuality within the confessional. Louis Dunn continued this practice throughout his career.

The initial development of Our Sisters of Our Lady of Providence a/k/a Mother of Hope Novitiate was formed in Hillsgrove, Warwick, and then transferred to Portsmouth, Rhode Island.  Monsignor Dunn, along with Bishop Russell J. McVinney, was an Officer of the Mother of Hope Novitiate Corporation.  *(App. Tab 184)*  Monsignor Dunn was appointed Chaplain, agent and/or Officer of the Mother of Hope Novitiate Corporation and supervised the education of the young women in their formation. *(App. Tab 31, 58)* As part of their initial formation, the young novices would take a ÒreligiousÓ name and were generally forfeited their family name.  *(App. Tab 59, p. 18)*  During their formation, concerns arose that Monsignor Dunn became too controlling influence in the young novices lives detrimental to their well being.  Monsignor Dunn began to distribute prescription drugs to them. *(App. Tab 96)*

Troubling reports of Louis Dunn early in his priesthood

In 1964, Patricia Fontes, a Superior Sister in that Order, wrote to Bishop McVinney to express her concern for the health and well being of the young novices who were under the influence of Monsignor Dunn. *(App. Tab 96)* After complaints were filed, Msgr. Dunn was transferred and appointed as Pastor, Agent and/or Officer of Christ the King Church Corporation.  *(App. Tabs 114, 186)*  Bishop Bernard Kelly was appointed as chaplain of the Sisters, however, Bishop Kelly left the priesthood, married and left the Diocese of Providence. *(App. Tab 59)*  The Mother of Hope Novitiate was eventually disbanded.

**Louis DunnÕs Conduct at Christ the King Church Corporation**

Maintaining his position as Vicar for Religious, Louis Dunn continued to recruit young girls to work in the rectory and encouraged religious vocations.   During his time at Christ the King, he became actively involved in the Newman Club, a group of young Catholics on the Campus of U.R.I.   Louis Dunn also recruited a number of young girls from the Newman Club and the parish to perform clerical and other duties at the rectory. *(App. Tab. 31, 110, 111, 116)*  Louis Dunn claimed that it was during his appointment at

Christ the King that he came in touch with his sexuality. (PSR)  Purportedly sanctioned by the new Constitution of Vatican II, Louis Dunn became sexually involved with a number of individuals.  He claimed that he engaged in sexual activity to alleviate them from their *depression* and to bring them ÒjoyÓ or ÒconsolationÓ  *(PSR)*, but claimed that he hid his sexual ÒrelationshipsÓ in order to Òavoid scandalÓ and preserve his ÒclericalÊ reputation.Ó (PSR)  Not too long after he had been appointed as Pastor of Christ the King, Monsignor Dunn continued his pattern of distributing prescription drugs to young girls and questioning them about their sexuality within the framework of the confessional. *(App. Tab 111, 116)*

**Dunn is reported to Bishop Russell J. McVinney**

_____While counseling Alice Bousquet, a young student at U.R.I., he made sexual advances.  Miss Bousquet disclosed the incident to her room mate, Judy Mirando, who later became a Providence Police Detective.  Alice had worked at the rectory performing various duties at the request of Louis Dunn.  Following that incident, Louis Dunn was reported to Bishop Russell J. McVinney by Judy Mirando. *(App. Tab 110)* Combining drugs, alcohol, and religious rituals, Louis Dunn, acting as God, induced a number of girls into engaging in sexual activity. *(App. Tab, 42, 116, 122.}* Louis Dunn impregnated at least two young students at U.R.I., one of whom was sent to California to give up the baby for adoption.

**Lucille Farr**

In approximately 1964-65, Lucille Farr, seventeen, entered the University of Rhode Island.  Lucille Forcier-Farr had aspired to enter the convent and was a member of the Newman Club.  She attended Mass at Christ the King Church and entered a pastoral relationship with Louis Dunn.  Louis Dunn as Vicar for Religious nurtured and directed Ms. FarrÕs formation with regard to the convent.  Using alcohol and prescription drugs, Louis Dunn induced Lucille into sexual submission which resulted in a pregnancy.  Ms. Farr was sent to St. AnnÕs Catholic Hospital in California by Louis Dunn to give birth to

the child and place the baby for adoption. Louis Dunn was familiar with these procedures from his years of working in the BishopÕs Office.*(PSR)* Although Louis Dunn claimed that had difficulty with giving the baby up for adoption, his primary concern was his priesthood. Lucille was instructed to change the names of the birth parent on the paperwork. During his time at Christ the King, Louis Dunn was appointed as the Defender of the Bond. *(App. Tab 183)* Louis Dunn was a member of the Marriage Tribunal, counseling individuals whom were in the process of preparing for annulments. *(App. Tab 114)*

## Maureen Pelosi

In approximately 1966, Maureen Pelosi, another young student who was studying to become a pharmacist, was disturbed after she received a telephone call from Louis Dunn. He claimed that her mother had volunteered her to perform some duties around the rectory. Ms. Pelosi felt very uncomfortable and initially agreed only that she would take the clerical work to her college dorm. Dunn was angry. She later refused all of Louis DunnÕs requests for assistance at the rectory. When she was a senior in college, she entered the confessional with Louis Dunn. Dunn asked Ms. Pelosi explicit questions regarding her sexual activities. After listening,he told her that she would rot in hell if she did not stop. *(App. Tab 111)* DunnÕs conduct led Ms. Pelosi to distance herself .

## Kathleen Moriarty Crist

In 1964, Kathleen Moriarty Crist, a teenager who had moved from South Dakota to Kingston with her parents. Dr. Thomas Moriarty, Department Head of Arts and Sciences at the University of Rhode Island allowed his three children to help out at Christ the King Church rectory at DunnÕs request. KathleenÕs two younger siblings eventually distanced themselves from Dunn. *(App. Tab 116)* After an incident took place as a junior in high school, Kathleen sought forgiveness from Dunn within the framework of the confessional. Following that confession, Dunn insisted that Kathleen begin counseling with him. *(App. Tab 116)*. Louis Dunn began giving Kathleen alcohol,

and prescription drugs, such as Darvan, Librium, Phenolbarbatol, Doridan, and Dexitrin. *(App. Tab 116)* Louis Dunn began to interfere in KathleenÕs relationship with her parents. *(App. Tab 42)* Dunn began to groom her and eventually engaged in sexual intercourse blended with religious ritual, drugs and alcohol.*(App. Tab 116)* Combined with the same elements, (drugs, religious rituals, and alcohol), Louis Dunn engaged in sexual acts with multiple young girls, including Kathleen, while he took on the role of God. After Kathleen entered the University of Rhode Island, Louis Dunn took more control over KathleenÕs life. Kathleen disappeared and became totally dependent on Dunn.

### Dr. Moriarty reports Louis Dunn to Bishop McVinney/Daniel P. Reilly

In approximately 1966, the Moriartys contacted Louis Dunn and then Bishop Russell J. McVinneyÕs Office, where he met with defendant Daniel Reilly. Kathleen returned to Rhode Island. After Lucille Farr had left for California to give birth to Louis DunnÕs child, in 1966, Kathleen, a freshman in college, was impregnated and forced to be subjected to a ÒD& CÓ, while Louis Dunn restrained her to ensure the termination of the pregnancy. *(App. Tab 42)* The incident left her with visible bruises on her face. *(App. Tab 42)* Her father found wandering about the campus, disoriented and bruised. Dr. Moriarty took Kathleen home, where she disclosed to her mother what had transpired. *(App. Tab 42)* Dr. Moriarty contacted Daniel P. Reilly, who was handling these types of matters for Bishop Russell McVinney. *(App. Tab 42, 43)*

Daniel Reilly met with the Moriartys and later with the Moriartys and Louis Dunn. Louis Dunn denied any wrongdoing, but Dunn claimed that a D&C was necessary because she had been raped by a negro and that he was obligated to ensure that the pregnancy would be discontinued. *(App. Tab 42)* Louis Dunn was transferred from Christ the King Church on September 8, 1967, after Dr. Thomas MoriartyÕs second complaint regarding DunnÕs criminal conduct. Dr. Moriarty had also disclosed the pregnancy of Lucille Farr. *(App. Tabs 42, 43)*

**More drug; abuse of children, young girls, and women seeking counsel for religious life or annulments; flight from prosecution and a promotion**

On September 8, 1967, Louis Dunn, along with some of the other named sexual predators were transferred to other new and unsuspecting parishes. Dunn was transferred from Christ the King Church and appointed as Pastor, agent and/or trusted Officer of St. Thomas Church of Manton Corporation. Louis Dunn believed that he had been transferred from Christ the King to St. Thomas Church of Manton as a result of his behavior with the girls at the college. At the same time as Louis DunnÕs transfer, forty two other priests, some of whom were known predators, were also transferred from one parish corporation to another. St. Thomas Church of Manton is located on Fruit Hill Avenue, within a quarter of a mile of R.I. College and is one of the primary parishes used by students of R.I. College. On the premises are an elementary school and a Convent. Louis Dunn was also appointed to the chaplaincy of another Convent, Franciscan Missionaries of Mary, less a half mile away. After Dunn had been transferred to St. Thomas Church of Manton, he continued his criminal conduct. Dunn immediately restaffed St. ThomasÕ Rectory with a number of young girls and women. Louis Dunn continued his criminal conduct of distributing prescription drugs and alcohol, while engaging in sexual conduct with minors. *(App. Tab 96)*

After Dunn had been transferred from U.R.I., Kathleen Moriarty disappeared from her home again. The Moriartys contacted police and attorneys in the State, but could not find assistance. *(App. Tab 41, 42)* Kathleen was eventually found in the southern end of Providence, R.I., after Louis Dunn had been followed by a former R.I. State Police detective who was a friend of Dr. MoriartyÕs colleague, but the detective was afraid to disclose his identity. *(App. Tab 42)* After a confrontation with Dunn, Dr. & Mrs. Moriarty was led to Kathleen, who was found very sick. *(App. Tab 42)* Kathleen was totally dependent on Louis Dunn, financially and otherwise. *(App. Tab 116)* Dr. Moriarty & Mrs. Moriarty were concerned for KathleenÕs well being and told Dunn that

they needed to get her to a doctor.  Dunn did not offer any assistance or encourage

Kathleen to return with her parents. *(App. Tab 43, p. 66)*

**Daniel Reilly blames the parents and the victim**

After finding their daughter, Dr. & Mrs. Moriarty turned again to Monsignor

Daniel Reilly in 1968.  Daniel Reilly faulted the parents for KathleenÕs behavior,

claiming that they had raised a defiant daughter. *(App. Tab 43, p. 67-68)*  Daniel Reilly

told Dr. & Mrs. Moriarty that he had done all he could; he had transferred Louis Dunn to

Providence, and that if he had put Dunn in jail, the girls would have gone to visit him

anyway.

With the encouragement of Lucille (Forcier) Farr, the mother of Louis DunnÕs

baby, Kathleen returned home to her parents and was immediately admitted to Rhode

Island Hospital.  Physicians advised the Moriartys that Kathleen should be enrolled in a

long-term drug program because she appeared to be over-drugged. *(App. Tab 42)*

**Phyllis Hutnak**

Almost immediately after his transfer, Dunn requested Phyllis Hutnak, a teenage

parishioner of St. Thomas Church of Manton to became involved in the parish and assist

in clerical duties at the rectory.  Dunn encouraged Phyllis Hutnak, a minor, to drink

alcohol and ingest prescription drugs provided by him.  Dunn induced Phyllis Hutnak into

sexual submission, took photographs for his sexual gratification, and used religious

rituals to carry out his sexual acts.  Louis Dunn transported Phyllis Hutnak to the State of

New Hampshire and Massachusetts for immoral purposes.  Phyllis Hutnak alleged that

Louis Dunn had sexually assaulted her in the States of N.H. and Massachusetts, as well.

In 1995, a lawsuit was filed by Anthony and Phyllis Hutnak which alleged that Louis

Dunn had sexually assaulted and exploited Mrs. Hutnak as a minor, combined with drugs

and alcohol, in and out of the State of Rhode Island.  In 1994, when the Hutnaks

disclosed the abuse, the defendants defamed the Hutnaks and claimed that they were liars.

*(App. Tab 96)*  The defendants settled with the HutnaksÕ in September of 2002.

**Donna Castellone**

In 1994, Donna Castellone alleged that Louis Dunn had taken her from her school St. Thomas Elementary when she was a young child and raped her in St. Thomas Rectory approximately 1967-68.  Ms. Castellone alleged that Louis Dunn used religious rituals to carry out his sexual abuse on her.

**Another Report to the BishopÕs Office**

In 1980, when Mary Ryan continued to be exploited by Dunn, a staff employee of St. Thomas Church notified defendant Monsignor Peter Cavanaugh, Personnel Director of the Diocese of Providence,  who resided with Louis Dunn at St. Thomas Rectory for many years. A staff member, who requested not to be identified, had advised Fr. Cavanaugh that she was concerned about Monsignor Louis DunnÕs conduct around young girls at the rectory and specifically expressed her concern for the well being and safety of Mary Ryan.   DunnÕs employee was asked to leave shortly thereafter.  Dunn claimed to a number of people that the employee had suffered a nervous breakdown because she was jealous and had desired him. *(App Tab 96)*

**Defendants transfer assets**

Following disclosure of Louis DunnÕs criminal conduct in March of 1994, defendants in concert with Dunn, dissolved DunnÕs personal corporation, the Joyful Servants of Jesus Corporation and transferred any and all of the assets into defendant St. Thomas Church of Manton Corporation.  The defendants than removed Dunn as a corporate officer of St. Thomas Church of Manton. *(App. Tab 184)*  Louis Dunn was one and the same with at least defendants Gelineau, Angell, Reilly, St. Thomas Church of Manton Corporation and Roman Catholic Bishop of Providence, a corporation sole.

The Ryans had collected several documents which showed the defendantsÕ pattern and practice of transferring sexual predators, including Louis Dunn and others. The defendants paid substantial monetary settlements,  settlements with silence agreements and denials of culpability.   The information had been given over to Mr.

Steven Robinson, *(App. Tab. 29, p.15 line 1-7)* but a substantial portion of the material has never been returned to the Ryans

## The Defendants exposed

A number of persons came forward and disclosed that they had reported Louis DunnÕs criminal conduct to Bishop Russell McVinney, Vicar General Daniel Reilly and/or the Vatican. The defendants were familiar not only with DunnÕs criminal history, but the criminal histories of a number of other predators. Defendant Gelineau had specifically assigned Defendant Paul Theroux to duty outside the diocese in 1990-91, through June of 1997, to the NCCB headquarters. During that time in Washington, DC, Paul Theroux served on the full-time staff of the NCCB's *Ad Hoc Committee on Sexual Abuse* while concurrently listed as a *Judge on the Tribunal* of the Diocese of Providence. Also during that time, Theroux was bestowed with the title of Monsignor and Deputy General Secretary serving the NCCB/USCCB.

## The Secrecy, Concealment and Conspiracy

The Ryans also discovered that defendants, including, but not limited to: Daniel Reilly, Russell J. McVinney, Robert Mulvee, Robert McManus, Kenneth Angell, Paul Theroux, Louis Dunn, George Frappier, John Darcy, Peter Cavanaugh and William Varsanyi had handled complaints against other alleged perpetrators, including, but not limited to: Alfred DesRosiers, Robert Carpentier, Michael LaMountain, William OÕConnell, James Silva, Henry Leech, Joseph A. Abruzzese, Robert Marcantonio, Edmond Micarelli, Richard Meglio, Brendyn Smyth, Joseph DÕAngelo, and Roland Lepire in the same manner. The Ryans discovered that the defendants had been fully aware of the danger that the other defendants posed to children, young people and vulnerable adults, yet had transferred them to various locations in and out of the State of Rhode Island, destroyed documents, and silenced victims through religious duress, monetary settlements, and other measures of intimidation in order to avoid detection and to shield the predators and themselves from prosecution.

**Complaints concealed**

Defendant McCarthy has since acknowledged that the defendants have received approximately three hundred fifty complaints, but has refused to release the information. *(App. Tab. 54)* The defendants would most often transfer the defendants from one so-called parish corporation to another. Sometimes, priests would be shipped in from other countries, as was alleged in the case of Brendan Smyth,  a priest who had been stationed in the State of Rhode Island with the express permission of Bishop Russell J. McVinney. Brendyn Smith was later exposed as having molested multitudes of children in Ireland and abroad.   In order to shield themselves from detection, the defendants would silence the victims.

**The victims are silenced**

The defendants employ various methods to silence the victims or their reporters, such as their practice of using religious duress and demanding that the person enter the ÒPontifical SecretÓ or the Sacrament of Confession, as Bishop Gelineau had tried to do with Mary Ryan in  February of 1994. *(App. Tabs 96, 97, 98, 99, 100, 102, 103, 118, 119, 121A, 121B, 152, 181, 182)*  The defendants promote the notion that the victim or reporter, who is sworn to secrecy by the Bishop, would be subject to *excommunication* (eternal damnation) if they do not comply.  Another method, used either separately or in conjunction with the Pontifical Secret, the confessional, or other religious duress (healing, or prayer service, ecclesiastic court settings) in order to sustain silence, is monetary settlement.  Monetary settlements are paid out with the agreement of silence of either the existence of the proceedings or, like in the cases in 2002, one may speak of the fact that there has been a settlement, but cannot speak of the proceedings.  These actions have been, thus far, quite effective in circumventing exposure and prosecution for crimes, ensuring the silence of the victims, and preserving the coffers of the church. *(Grand jury reports of New Hampshire, Rockville, New York-Judicial Notice Document In Box No.Õs 90(B), 90(C)* Fr. Thomas Doyle, a former delegate of the Vatican Embassy, Canon

Lawyer *(Report of Thomas Doyle, to U.S.C.C.B, - Judicial Notice Doc. Document missing)*

Fr. Thomas P. DoyleÕs Report to the U.S.C.C.B (1985).

## The Doyle Report

In 1985, Fr. Thomas P. Doyle, the late Fr. Michael Peterson, MD, and Ray Mouton submitted a report to the U.S.C.C.B. in order to address the issue of clergy sexual abuse within the Roman Catholic Church. The report, entitled *The problem with sexual molestation by Roman Catholic clergy: Meeting the problem in a comprehensive and responsible manner,* warned the bishops, among other things, of the extent of the problem and the harm to those abused by clergy. The 92-page internal report to American Bishops on pedophilia discussed many issues, including his assessment that financial devastation was inevitable if the Bishops continued to ignore the issue. Fr. DoyleÕs report was ignored.

## Mr. McCarthy continues to hold himself out as independent investigator

In the spring of 1995, Mr. Robert McCarthy held a meeting in Harrisville, Rhode Island. Although McCarthy was hired by defendant Gelineau to investigate and prepare a defense for the diocese in the case of potential litigation, Mr. McCarthy presented himself to the public as an independent investigator, retired Massachusetts police officer, and someone who closely worked with the now Ret. Colonel Culhane, R.I. State Police and local police departments in the State of Rhode Island, to investigate sexual crimes of priests in the Diocese of Providence. Mr. McCarthy presented that he had worked with other public law enforcement officials who investigated the sexual abuse in the Diocese of Providence. *(App. Tab 87)* Mr. McCarthy continued to lead the public to believe that he was working closely with the R.I. Attorney GeneralÕs Office, local police and State police departments as an independent investigator, and had encouraged victims to contact him. The defendants continued to advocate Mr. McCarthyÕs position on their official web site through at least 2003, until the R.I. Attorney GeneralÕs Office was notified.

*(App. Tab 187)*

In 1995, Bishop Robert E. Mulvee was appointed to the Diocese of Providence as Coadjutor Bishop.

## RYANS FILED THE LAWSUIT

PLAINTIFFS filed a lawsuit on December 6, 1995, against several corporate, hierarchical and employee/employer defendants upon beginning to discover in February 1994 and thereafter that these defendants collectively had engaged in fraud and conspiracy and other criminal conduct including, but not limited to, bribery, extortion, aidiing and abetting, narcotics, attempted murder, harboring criminals, evading prosecution, financially and otherwise aiding criminal conduct involving the sexual abuse and exploitation of children and vulnerable adults and repeatedly , knowingly placed criminals and predators in positions where they would have access to  unsuspecting victims, including plaintiffs.  Plaintiffs moved to file their lawsuit after they initially turned to Defendant Gelineau in February 1994 for counsel regarding the sexual abuse of Mary Ryan by defendant Dunn, and,  after Gelineau and his agents/employees intimidated and coerced plaintiffs and other witnesses to silence them using various methods including, but not limited to, religious duress, threats, harrassment and bribery. Defendants continued their these methods hroughout the years.

Following the filing of Ryans lawsuit, their civl case immediately came to a halt due in part, to a criminal proceeding involving defendant Louis Dunn and the entanglement of a procedurel quagmire which initally developed as a result of interference by (defendant attorneys) other plaintiffsÕ attorneys who had similar complaints against the defendants and defense attorneys who were anxious to obtain a summary judgment without having to submit to pretrial orders of discovery or a trial.

Prior to the assignment of the RyansÕ civil case, Judge Richard Israel, was assigned multiple cases described in the previous paragraph and had issued a stay in those cases pending a R.I. Supreme Court ruling on four certifed questions he had submitted to

them.

In May of 1996,  Hierarchical defendant Dunn was indicted on two counts of sexual assault on two individuals. Due to the nonexistence of language of sexual assault laws prior to 1982, and the necessary modification other laws necessary to prosecute and jurisdictional issues, Dunn could not be prosecuted for his criminal conduct which took place prior to 1982.  In 1979, P.L. 302 abolished rape and established the language of First Degree Sexual Assault. The language was not changed in R.I.G.L. ¤12-12-17, until 1981. P.L. ¤75 (App. 203, p. 15-17)Consistent with Constitutional mandate, the State was unable to prosecute Dunn for sexual assaults in the first degree and also criminal conduct which took place beyond the R.I. State boundary.

On June 24, 1997,  Dunn was convicted for sexually assaulting plaintiff Mary Ryan.  After commending both the prosecution and defense counsel for their professional conduct, Justice Stephen Fortunato, the criminal trial justice, found that:

"...Dunn became a parental surrogate in this young girl's life at about the time that she was 16. He took over where one would expect a parent to be in terms of discipline and instruction, but he took over in a way that no normal or right thinking participant or stepparent would take over.Ê He began a pattern of sexual predations against this girl who at the time was 16 and whom he knew had been a victim from the age of 3 to 13 at her father's perverted hands.* * *...he began a conscious plot to overcome this young womanÕs resistance, and then to use her and abuse her for his own sexual gratification.  The evening in question that gave rise to Count 2 followed upon three or four years of his sexual activity with her. There could well be an argument made, and, indeed, defendant has made it through his attorney, that these were consensual acts. I need not resolve the issue with any great precision as to where his will ended and her free will began, but it is clear that some very substantialÊ amount of psychological coercion was employed and that he took advantage of his priestly collar and is role within her

34

life,Ê not to mention his knowledge gained as a confidant about her prior history

to prey upon her."

Dunn was incarcerated and held without bail.  After receiving numerous unauthenticated

letters from parishioners, Dunn was granted a new trial and the criminal proceedings
continued for another two and a half years to December of 1999 after DunnÕs conviction
was reinstated.

While the criminal proceedings remained pending, the RyansÕ case experienced

much inappropriate interference which had the effect of entangling the Ryans into a

procedural quagmire which ultimately led to the demise of their civil case.

Without any assignment or notice to the Ryans or their counsel, December of

1997, the RyansÕ case was raised within the framework of a hearing involving other

plaintiffsÕ cases which had been assigned to Judge Israel regarding defendantsÕ motion

to dismiss against those plaintiffs.  Judge Israel refused to rule in the the RyansÕ case

without affording them due process of notice and a hearing.  Noting that he is Òstickler

for due processÓ,  Judge Israel placed his ruling with regard to the Ryans on the face of

his Order in *Daniel Heroux vs. Robert Carpentier*, 92-5807 January 23, 1998.
"Because of an inadvertent omission of notice of hearing on this motion to
counsel for the plaintiff in *Mary Ryan, et al. v. Roman Catholic Bishop of Providence, et
als.*, C.A. No.          PC 95-6524, this decision and any order(s) entered pursuant thereto
will not be binding            on the plaintiffs in that case.Ê Those plaintiffs will be
afforded an opportunity to be          heard, if they request one.ÓÊ

On  February 20, 1998, more than two years after the Ryans had filed suit, the

RyansÕ attorney Stephen Robinson appeared before Judge Israel for the first time  He

restated his previous ruling that he would not enter Orders in the RyanÕs case without

affording the them due process to address him separately on the issues.  Since the

multiple cases were consolidated for management purposes only, any Orders were to be

entered separately in each individualÕs case, .  Following the February hearing, a Special

Order was entered  by Judge Israel on March 4, 1998, assigning the RyanÕs case to his